**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 21-20055-01-DDC** |
| **MAURICE T. JONES,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Defendant Maurice T. Jones has filed three pretrial motions in this case:  a Motion to Suppress (Doc. 34); a Motion to Dismiss (Doc. 35); and a Motion for Additional Discovery (Doc. 36).

The government has filed a Response to Defendant's Motion to Suppress (Doc. 45). Defendant has replied (Doc. 49).  The government also has filed a Response to the Motion for Additional Discovery (Doc. 46), and defendant has replied (Doc. 48).  The court stayed briefing on defendant's Motion to Dismiss (Doc. 35) pending the resolution of the Motion for Additional Discovery (Doc. 36).

On February 15, 2023, the court conducted an evidentiary hearing where the parties presented evidence relevant to both the suppression and additional discovery motions.  After the hearing, Mr. Jones filed a Post-Hearing Brief (Doc. 66), and the government responded (Doc. 67).  Based on the evidence presented, and for reasons explained below, the court denies Mr. Jones's Motion to Suppress (Doc. 34) and his Motion for Additional Discovery (Doc. 36).

## I.       Background and Controlling Facts

The court held an evidentiary hearing on February 15, 2023, and unless otherwise noted, makes the following factual findings from the evidence presented there.[1]

On November 27, 2017, at 2:06 a.m. Lenexa Police Department Officer Matthew DeLoux pulled over defendant Maurice T. Jones after Officer DeLoux observed Mr. Jones's obscured license plate.  From the stop and subsequent search, Officer DeLoux uncovered contraband that led to Mr. Jones's arrest and indictment.

### *The Traffic Stop*

While driving night patrol in Lenexa, Kansas, Officer DeLoux noticed a dark sedan on the road at about two in the morning.  Officer DeLoux followed the car as it turned off Quivira Road onto 77th Terrace, in Lenexa.  He determined that he couldn't read the license plate when he was within 50 feet of the car.[2]  He couldn't read the license plate because, as he observed: one license plate light wasn't working; and a clear cover reduced the plate's visibility.  From 77th Terrace, Officer DeLoux followed Mr. Jones's car into an apartment complex parking lot. He testified that even after Mr. Jones pulled into a parking spot in the lot, and his car followed,

---

[1]      At the hearing, Officer Matthew Deloux's patrol car's dash camera footage was admitted as government's Exhibit 1.  Officer Deloux also testified.  Professor Charles R. Epp testified as an expert witness on behalf of defendant.  An investigator from the Office of the Federal Public Defender, Zay Thompson, and defendant's then-girlfriend and owner of the searched car, Cherise Farr, also testified as witnesses for defendant.

[2]      Lenexa Ordinance Section 126.1 prohibits "any person to attach and display on any vehicle a license plate . . . which is covered, in whole or in part, with any clear or opaque material or any other plastic-like material that affects the plate's visibility or reflectivity."  Lenexa Ord. § 126.1; *see also* K.S.A. § 8-15, 110(a) (prohibiting the same).

Officer DeLoux testified that between government's Exhibits 14 and 15 (screenshots from his patrol car's dashcam), he estimated that he was about 50 feet behind the vehicle, and he could not read the license plate.

he still couldn't read Mr. Jones's license plate.[3]  In fact, Officer DeLoux recalled that he couldn't

read the license plate until after he got out of his car.  After following the car into the parking lot

of the apartment complex, Officer DeLoux turned on his lights and pulled over Mr. Jones.

### The Search

After pulling into the apartment parking lot, Mr. Jones got out of the car, locked it, and

walked away—behavior that Officer DeLoux found unusual.  As Mr. Jones opened the door to

exit his vehicle, Officer DeLoux smelled an odor of burnt marijuana.  Officer DeLoux

approached Mr. Jones and asked him to get back into his car.  Mr. Jones did so.

Officer DeLoux asked Mr. Jones for his driver's license and proof of insurance.  He

couldn't provide either.  Officer DeLoux then asked Mr. Jones for his name and social security

number.  Mr. Jones provided a name, "Jonathan Farr," but said he didn't know his social security

number.  Officer DeLoux testified that, in his experience, Mr. Jones's answer suggested he

wasn't providing his real name.  Mr. Jones then asked if he had done anything wrong, and

Officer DeLoux didn't answer him.  Dispatch informed Officer DeLoux that they couldn't locate

a Jonathan Farr in the system.  Around this point, a second officer, Officer Ben Asplund, arrived

on scene.

Once Officer DeLoux formed the belief that Mr. Jones had provided false information

about his identity, he asked Mr. Jones to place his keys and phone in the center cupholder and get

out of the car.  Mr. Jones complied.  Officer DeLoux handcuffed him, patted him down, and

---

[3]       When asked about government's Exhibit 20 (another still frame from his dash cam—taken when his police cruiser was closer to the car than Exhibits 14 and 15), Officer DeLoux testified that he still couldn't read the license plate.  When defense counsel asked about Exhibit 21 (the closest, still frame harvested from the dash cam's video—within 8 to 10 feet), Officer DeLoux testified that he was no longer attempting to read, or even concerned with reading the license plate at that point.  Instead, the officer explained, he was concerned about how many occupants would step out of the car he had followed and he didn't yet know the identity or intent of the driver.

detained him in the patrol car.  While Officer DeLoux took Mr. Jones over to his patrol car, Mr. Jones provided a second false name, "Christopher Spriggs."  He also provided a birthdate. Officer DeLoux ran this information through dispatch.  Dispatch informed Officer DeLoux that they had located a "Christopher T. Spriggs" but one with a different birthdate.  Officer DeLoux then asked Mr. Jones why he was lying about his identity.  Mr. Jones admitted that he had outstanding warrants for his arrest.  Dispatch informed Officer DeLoux that a "Christopher T. Spriggs" had several pending arrest warrants.

Officers DeLoux and Asplund then decided to search the car for the marijuana Officer DeLoux had smelled earlier.  Mr. Jones had locked the keys in his car, but the two officers opened the car door with a "slim jim" while Mr. Jones sat in the patrol car.  Once they got the car unlocked, officers found a fully loaded Glock handgun on the passenger side floorboard and a black backpack on the right passenger seat in the back.  It contained ammunition and drug paraphernalia.  They also found "loose marijuana" between the driver's seat and center console.

Officers then arrested Mr. Jones and took him to the Johnson County Detention Center. On November 29, 2017, the Johnson County Sheriff's Office contacted Officer DeLoux and informed him, based on fingerprints, they'd identified his arrestee as defendant Maurice Jones, not Christopher Spriggs.  Mr. Jones had an active probable cause warrant out of Jackson County Missouri Circuit Court for second degree murder and armed criminal action.

Mr. Jones now moves to suppress all evidence acquired following the traffic stop—a Glock 19 Gen 4 handgun with a 50-round 9mm drum magazine, and a backpack that contained a firearm magazine holding 15 rounds of 9mm ammunition, a digital scale with white residue on it, a box of unused sandwich baggies, and two tied off baggies containing cocaine.

***Car Tow***

After the officers searched the car and found this evidence, they ordered a tow truck for the car.  Officer DeLoux testified that he had planned to tow Mr. Jones's car even if the car had remained locked and he hadn't searched it.  He explained that according to Lenexa Police Department's policy, when a vehicle is towed an inventory search follows.  He also testified that once the driver of a vehicle is arrested, Lenexa's policy calls for him to tow the driver's vehicle. The government admitted Lenexa's Tow Policy as Exhibit 4 and Lenexa's Vehicle Inventory Policy as Exhibit 3.

When asked why this situation qualified for a tow under the tow policy, Officer DeLoux explained that he had arrested the sole occupant of the vehicle, Mr. Jones.  Mr. Jones didn't have paperwork to determine who the vehicle was registered or belonged to; and Mr. Jones had already provided Officer DeLoux with false information.  Thus, he asserted that he didn't know who rightfully owned the car.  Officer DeLoux also testified that Lenexa's Tow Policy didn't require him to leave the car parked even if it was legally parked.

Defendant presented evidence designed to support his assertion that the car at issue here didn't qualify for tow under Lenexa's Tow Policy.  Mr. Jones informed the officers that his girlfriend, Cherise Farr, owned the car, and that she lived in the apartment complex where he had parked the car.  Mr. Jones told Officer DeLoux that his girlfriend could bring the paperwork for the car outside.  Mr. Jones also offered to call his girlfriend for this documentation multiple times.  But Officer DeLoux declined the offers and, in the end, didn't find this information relevant to his decision to tow the vehicle.

Officer DeLoux conceded that the car—when they ultimately towed it—didn't present a traffic hazard and was parked on private property.  He also conceded that the officers had the

ability to secure or lock the car and thus could ensure nothing was taken from it, even without a tow.  Eventually, Officer DeLoux ran the car's plates, and the registration came back to Cherise Farr, the name Mr. Jones had supplied for his girlfriend and owner of the car.  Officer DeLoux never attempted to contact Ms. Farr about her car.

### Testimony Relevant to the Selective Enforcement Claim

At the February 15 hearing, the court also received evidence relevant to defendant's selective enforcement claim, and his motion to discover additional evidence to support that claim.  This evidence falls into two distinct categories.  First, the court heard evidence from Officer DeLoux about the night at issue and his motivation for initiating the traffic stop.  Second, the court heard evidence from defendant's expert witness, Professor Charles Epp.  He testified about policing and race.  The court describes the relevant facts established in their testimony, below.

Officer DeLoux was patrolling the area of 79th Street and Quivira Road when he first saw Mr. Jones's car.  He testified that he couldn't recall specifically where he was located when he first saw the car.  Also, he couldn't remember the direction he was travelling before he got behind Mr. Jones.  Officer DeLoux agreed with defense counsel that—based on the time stamps from his dash cam showing that he had to accelerate to catch up to Mr. Jones—it was possible that he had passed Mr. Jones on Quivira Road, or that he was on the same side of the road as Mr. Jones and saw him as he drove past.  Officer DeLoux also testified that his car's acceleration could mean that he travelled at a distance behind Mr. Jones and could have needed to speed up—no matter the direction of approach.  The testimony didn't eliminate any of the likeliest scenarios for first encountering Mr. Jones's car.

Asked to explain what it was that drew his attention to Mr. Jones's car that night, Officer DeLoux explained that in Lenexa at two in the morning on a weeknight, he would get behind any car on the road and run the license plate to check for outstanding warrants. He engaged in this kind of investigation because he typically didn't see much traffic on the road at that time of night, in Lenexa. The officer recalled that there weren't any other cars driving around the area the night he pulled over Mr. Jones. He testified that he would follow a car at this time of night simply because it was the only car on the road out at the time.

Officer DeLoux asserted that he didn't pull Mr. Jones over because of his race. He testified that when his car was within 8 to 10 feet of Mr. Jones's car, he couldn't determine how many people were in the car—let alone the race of anyone in the car. He testified that he didn't determine the race of Mr. Jones until Mr. Jones stopped and got out of his car in the apartment parking lot. When asked directly if he decided to stop this car because the person inside was White or Black, Officer DeLoux answered no.

Officer DeLoux estimated that he has conducted thousands of traffic stops in his career as a patrol officer. He has conducted other stops because of obstructed or obscured license plates, and some of those stops included cars with clear license plate covers. In his experience, it's very difficult to read license plates through clear covers. He testified that his traffic stop of Mr. Jones was no different than any other stop he has conducted for a suspected license plate obstruction because of a clear cover.

The court now summarizes the testimony of defendant's expert witness, Professor Charles Epp. Professor Epp has authored numerous books and articles about policing and racial profiling. He has conducted research about policing and race in the Kansas City area. Professor Epp conducted a study in the Kansas City metro area where he surveyed 2,346 drivers. That

study found that drivers in the Kansas City metro experience two different types of police stops: *One*, a stop to sanction unsafe driving behavior—a "traffic safety stop;" and *two*, a stop to check out the driver—an "investigatory stop."  Professor Epp's study found no significant racial disparity for traffic safety stops, but he did find a significant racial disparity for investigatory stops.  This study found that in the Kansas City area, officers stopped Black drivers nearly three times as often as White drivers.  Professor Epp hypothesized that because officers exercise more discretion when conducting investigatory stops, they stop more Black drivers because of their own implicit biases or stereotypes.

The study found a greater racial disparity in stops occurring in Kansas City's suburbs as compared to the core city.  And Professor Epp testified Lenexa fits the description of a Kansas City suburb.  He testified that many studies across the United States have replicated his study and reached the same results—racial disparities concentrated in investigatory stops.

Professor Epp testified that to determine whether Officer DeLoux had stopped Mr. Jones because of his race, it would help to have data about the stops Officer DeLoux has made over the period of several years.  This information would include the race of the driver for each stop, the reason given for the stop, whether the officer had issued a citation, and whether he had conducted a search after the stop.  That data could help to place this particular stop—the traffic stop of Mr. Jones in November 2017—into context, showing how Officer DeLoux has conducted traffic stops over the past few years.  To put it simply, defendant's requested discovery seeks an answer to this question:  Does Officer DeLoux's record show a pattern of over-selecting Black drivers for traffic stops?  Professor Epp hypothesized that records for Officer DeLoux's stops from March 2016 to March 2018 would reveal patterns of racial disparity.  He based this opinion

on past evidence, past results in other locations, and the results of his study about the Kansas City area generally.

During Officer DeLoux's time at the Lenexa Police Department, he conducted 2,223 stops.  Out of those 2,223 stops, he issued 598 citations.  Professor Epp testified that Officer DeLoux's 27% citation rate indicates that he tended to conduct more investigatory stops than the average officer.  Based on his research of investigatory stops, Professor Epp opined that an investigatory stop often is based on race.

Finally, Professor Epp testified that the make and the model of a car also could contribute to patterns of racial disparity in investigatory stops.  Police officers selected older domestic luxury cars—such as Cadillacs and Lincolns—at a higher rate than other cars for investigatory stops.  Professor Epp opined that social science literature about cultural stereotypes supports an inference that Black people drive older, domestic luxury cars more frequently than White people.  Unlike the professor's other opinions, this premise—that Black people are more likely to drive older, domestic luxury cars—wasn't based on data he had collected.  Thus, Professor Epp concluded, officers may use car type as a proxy for race, to identify and select Black drivers for investigatory stops.  He testified that the car in this case—a 2002 Lincoln LS—fits into the relevant category of older, domestic luxury cars.

## II.    Analysis

### A.  Fourth Amendment Challenge to the Traffic Stop and Search

Mr. Jones asks the court to supress evidence secured in his traffic stop primarily for two reasons.  He argues that Officer DeLoux conducted an unreasonable seizure and search, violating his Fourth Amendment rights by (1) seizing him during the traffic stop without reasonable suspicion, and (2) searching the car after his arrest without probable cause.  The government

disputes both arguments.  It argues that Officer DeLoux had reasonable suspicion to conduct a traffic stop because of an unreadable license plate, and he possessed probable cause to search defendant's car for narcotics after detecting the smell of marijuana coming from it.  In addition, the government argues that the officers inevitably would've discovered the contraband in the car by independent lawful means.  Thus, it argues, the court shouldn't exclude the evidence no matter how it determines defendant's Fourth Amendment issues.  The court discusses each argument, below.

### 1. Did Officer DeLoux observe or reasonably suspect a traffic violation when he pulled Mr. Jones over? (*i.e.*, was the stop justified from its inception?)

First, the parties disagree whether Officer DeLoux conducted the traffic stop properly. Mr. Jones argues that Officer DeLoux's actions that night amounted to an investigatory stop without reasonable suspicion.  Mr. Jones asserts that Officer DeLoux pulled him over only because he had a license plate cover on his license plate, and that this condition, without more, can't suffice to justify a traffic stop.  Mr. Jones argues that there was neither a traffic violation nor a reasonable appearance of a traffic violation—thus, the stop was unlawful.  Mr. Jones asserts that the license plate on the car he was driving—even with the clear plastic cover—was visible from 50 feet.  He also asserts that Officer DeLoux had no other reason to stop the car.[4] The government disagrees.  It argues that Officer DeLoux couldn't read the license plate, and thus he observed or, at minimum, reasonably suspected a traffic violation.

---

[4]        Defendant also discusses Lenexa Traffic Ordinance § 147(c).  In the final police report, Officer DeLoux reported that one of Mr. Jones's two license plate lights was out which violates Section 147(c) (in addition to the § 126.1 violation).  The government didn't respond to this argument, or ever argue that the unilluminated license plate light outage gave rise to Officer DeLoux's suspicion that Mr. Jones violated a traffic law.  So, the court's analysis doesn't address it either.

"A traffic stop is a seizure within the meaning of the Fourth Amendment[.]" *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995). But "[a] traffic stop is permissible under the Fourth Amendment if the officer has a reasonable articulable suspicion that a traffic violation has occurred or is occurring." *United States v. Vazquez*, 555 F.3d 923, 928 (10th Cir. 2009) (quotation cleaned up). This rule means that when an officer observes or reasonably suspects a traffic violation, the stop is objectively justified. *Botero-Ospina*, 71 F.3d at 786 (explaining that a traffic stop is analogous to an investigative detention, thus courts apply the "principles pertaining to investigative detentions set forth in [*Terry*]" to determine reasonableness of traffic stop (citing *Terry v. Ohio*, 392 U.S. 1, 88 (1968))). The court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Botero-Ospina*, 71 F.3d at 787 (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)). This limited inquiry means it's "irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.*

Our Circuit enumerates a two-step inquiry to determine whether a traffic stop violates the Fourth Amendment. *United States v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005). First, the court must "determine whether the officer's action was justified from its inception, and, second, whether the action was reasonably related in scope to the circumstances that justified the interference." *Id.* Here, defendant contests the first prong of this inquiry—that the initial stop of his vehicle was "justified from its inception."

To support his theory that Officer DeLoux didn't actually observe a traffic violation, defendant presented testimony about a license plate cover experiment conducted by Zay Thompson. Mr. Thompson, an investigator working for the Kansas Federal Public Defender,

conducted an experiment designed to show how clear license plate covers affect license plate

visibility.  Mr. Thompson conducted the experiment about ten o'clock on a residential street.

Streetlights illuminated both sides of the street he selected for his experiment.  Mr. Thompson

parked a car with a clear license plate cover and one of its license plate lights shrouded to nullify

its effect.  He shrouded the one license plate lamp to replicate the burned-out bulb on the car

driven by Mr. Jones.  Mr. Thompson observed this car from inside another car from 50 feet away

and 100 feet away.  Mr. Thompson ran through different scenarios—using his regular headlight

beams, his low headlight beams on, with the license plate cover covering the tag, and without a

license plate cover.  He videotaped and photographed these scenarios.  He testified that in each

scenario, at each distance, he could read the license plate with his naked eye.  But in certain

scenarios, the lights from his car rendered the license plate unreadable in the photographs.  He

testified that when the car had a clear plate cover on the tag and one license plate light

shrouded—all consistent with the description of Mr. Jones's car in the police reports—he could

read the license plate from 100 feet behind the car.

On the issue whether Officer DeLoux could read Mr. Jones's license plate from 50 feet,

the court finds the government's evidence—*i.e.*, Officer DeLoux's testimony—far more

persuasive.  To start, serious shortcomings inhere within defendant's field experiment.  Mr.

Thompson conducted the experiment on a materially different street.  He observed the car on a

street well lighted by streetlights.  Officer DeLoux pulled Mr. Jones over in the middle of the

night and followed him onto a side street without any streetlamps.  Next, Mr. Thompson staged a

parked car and sat in a parked car behind it.  Officer DeLoux observed a moving car from his

own moving car.  Finally, Mr. Thompson didn't use the license plate cover from Mr. Jones's car

or a replica of it.  Instead, he used a brand new, just out-of-the-package license plate cover.  This

new license plate cover didn't replicate the used cover on Mr. Jones's car.  Mr. Jones asks the

court to conclude from this experiment, that Officer DeLoux, in fact, could read Mr. Jones's

license plate from 50 feet away the night of November 27, 2017.  That's a logical leap the court

isn't willing to undertake from this case's evidence.

The court finds that the government's evidence supporting the conclusion that Officer

DeLoux had "a reasonable articulable suspicion that a traffic violation [had] occurred" outweighs

defendant's evidence supporting the opposite conclusion.  *Vazquez*, 555 F.3d at 928.  To support

its position that Officer DeLoux observed a traffic violation, the government introduced video

footage from Officer DeLoux's patrol car and testimony from the officer himself.  Officer

DeLoux testified that he couldn't read Mr. Jones's license plate when he approached his car on

Quivira Road, from a distance, he estimated, was within 50 feet.  He testified that he couldn't

read the license plate even as he got much closer to Mr. Jones's car.  While reviewing footage

from his patrol car's dash camera and still shots of that footage, Officer DeLoux recalled that the

night he pulled Mr. Jones over, he had, in fact, observed this traffic violation.

The evidence demonstrated that it's more likely than not that Officer DeLoux observed a

traffic violation—or, at very least possessed a "reasonable articulable suspicion that a traffic

violation ha[d] occurred or [was] occurring."  *Id.*; *see also United States v. Granados-Orozco*,

No. 03-40035-01/02-SAC, 2003 WL 22213129, at *2 (D. Kan. Aug. 26, 2003) ("Officers should

not be required to stop vehicles in order to read their tags."); *United States v. DeGasso*, 369 F.3d

1139, 1143 (10th Cir. 2004) (affirming reasonableness of traffic stop for license plate violation).

The court finds Officer DeLoux's testimony sufficient "to meet the low reasonable suspicion

bar[.]"  *United States v. Anderson*, No. 21-2151, 2023 WL 2485656, at *4 (10th Cir. Mar. 14,

2023).

Thus, the court finds that the November 27, 2017, traffic stop was objectively reasonable. The court won't exclude the evidence on this basis.  Next, the court addresses defendant's probable cause argument.

### 2.   Did Officer DeLoux develop probable cause to search the car?

Next, Mr. Jones argues that after Officer DeLoux placed him in custody, the officer didn't have any justification to search his car.  Mr. Jones contends that Officer DeLoux's observation that the car "smelled like weed" wasn't credible enough to support probable cause to search the car.  To support his position, Mr. Jones explains that the amount of "green leafy substance found between the passenger seat and the door" was "minuscule" and thus "not recovered as evidence."  Doc. 34 at 8.  However, Mr. Jones failed to cite any legal authority to support his proposition that when a search doesn't uncover the substance purportedly giving rise to the probable cause justifying it—the odor—the original justification isn't credible.  Indeed, our Circuit has reached exactly the opposite conclusion.  *See United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009) ("the probable cause inquiry is not restricted to a particular offense, but rather requires merely that officers had reason to believe that a crime—any crime— occurred").

"'[W]hen . . . officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband.'"  *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015) (quoting *Florida v. White*, 526 U.S. 559, 563–64 (1999)).  The Tenth Circuit has held that the smell of marijuana coming from a vehicle or person inside the car establishes probable cause to search the vehicle for illegal substance.  *Id.*; *see also United States v. Johnson*, 630 F.3d 970,

973–74 (10th Cir. 2010) (holding "the odor of marijuana by itself is sufficient to establish probable cause").

The government argues that Officer DeLoux possessed probable cause to search the vehicle for narcotics based on smelling marijuana. It contends that the permissible scope of the search extended to the backpack in Mr. Jones's car because it was "a container of a size and shape to hold contraband." Doc. 45 at 15. Again, the court agrees. *See United States v. Ross*, 456 U.S. 798, 800, 823–24 (1982) (holding that officers with "probable cause to believe that contraband is concealed somewhere within [a car] may conduct a probing search of compartments and containers within the vehicle").

Officer DeLoux testified that he smelled marijuana when Mr. Jones first got out of his car. The officer didn't search the car immediately after smelling the marijuana because he was, at that point, the only officer on scene. He elected to wait for a backup officer to arrive before taking any action that might escalate the situation—as arresting Mr. Jones or searching his car might have. But once the other officer arrived and Officer DeLoux had arrested Mr. Jones, he decided to search the car for narcotics based on his earlier observation that the car smelled like marijuana.

The court finds the officer's testimony about the odor he detected from the car's interior credible. After all, there's no dispute that the search located a miniscule amount of marijuana inside the car. This evidence sustains a logical inference that marijuana was inside the car at one point. Also, the car's search yielded evidence of drug trafficking—a scale, baggies, a handgun with an extended capacity, and two tied-off baggies containing cocaine. Officer DeLoux's detection of "the marijuana smell emanating from the car" (or from Mr. Jones) established the necessary "probable cause to search [the] vehicle for the illegal substance." *See Snyder*, 793

F.3d at 1244.  Thus, the court finds that Officer DeLoux possessed probable cause to search Mr.

Jones's car.

### 3.   Would officers have discovered the contraband inevitably through lawful means?

The government argues that even if the court found the search unconstitutional, the

inevitable discovery doctrine applies, and thus the court shouldn't exclude the evidence.  The

inevitable discovery doctrine spares evidence from suppression "if an independent, lawful police

investigation inevitably would have discovered it."  *United States v. Martinez*, 512 F.3d 1268,

1273 (10th Cir. 2008) (quoting *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir.

2005)).

The government argues that because the officers had called a tow truck to tow Mr.

Jones's car, officers would have discovered the evidence inevitably through a legitimate

inventory search.  To support this argument, the government presented testimony from Officer

DeLoux about the Lenexa Police Department's Vehicle Towing Policy.  Officer DeLoux

testified that, under this policy, defendant's failure to produce identification or proof of insurance

or vehicle ownership coupled with providing officers false information justified his decision to

tow the car.

Mr. Jones argues that the Lenexa Police Department's Vehicle Towing Policy can't

justify a tow in these circumstances.  He argues, no legitimate inventory search would've

occurred in place of the search that actually occurred.  Thus, he contends that police wouldn't

have discovered the contraband but for the allegedly unconstitutional search.  In his post-hearing

brief, defendant argues that the car's impoundment (1) wasn't justified under a standardized

policy and (2) it fails the five factor test for a reasonable, non-pretextual rationale of community

caretaking for a tow.  *See United States v. Sanders*, 796 F.3d 1241, 1248 (10th Cir. 2015)

(holding "that impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale.").

Inevitable discovery here is a close call. But because the court finds that Officer DeLoux had reasonable suspicion to conduct a traffic stop and probable cause to search Mr. Jones's car, it doesn't need to reach the inevitable discovery issue. *See Snyder*, 793 F.3d at 1244 ("We need not reach the applicability of the inevitability doctrine [because] the record clearly establishes the officers had probable cause to search [defendant's] vehicle based on the marijuana smell emanating from the car."). Officer DeLoux conducted a legitimate warrantless search under the Fourth Amendment. Thus, the government doesn't have to show that the officers inevitably would've discovered the evidence through other means. For these reasons, the court denies Mr. Jones's Motion to Suppress (Doc. 34) without deciding the inevitable discovery question, and now turns to defendant's Motion for Additional Discovery (Doc. 36).

### B. Request for Additional Discovery

Separately, defendant moves to dismiss this case based on Officer DeLoux's selective enforcement of traffic laws. Doc. 35. Specifically, defendant asserts that Officer DeLoux stopped him based on his race and thus subjected him to selective enforcement of Section 126.1 of the Lenexa Traffic Ordinance. *Id.* at 1. To support his selective enforcement claim, defendant has requested additional discovery. Doc. 36. He seeks detailed records about Officer DeLoux's traffic stops. *Id.*

"The 'Constitution prohibits selective enforcement of the law based on considerations such as race.'" *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1263 (10th Cir. 2006) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). The "standard for proving a

selective-enforcement claim" is "'a demanding one.'" *Id.* at 1264 (quoting *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003) (standard for selective enforcement claim is analogous to standard for selective prosecution claim)). "A defendant 'challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.'" *Id.* at 1264 (quoting *Marshall*, 345 F.3d at 1168).

Similarly, the standard for securing the right to conduct discovery on this type of claim is a high one. *Id.* ("[f]or similar reasons discovery is limited"). Our Circuit has identified the requisite showing a defendant first must make to secure discovery about a selective enforcement claim. The Circuit views this standard "'"itself [as] a significant barrier to the litigation of insubstantial claims."'" *Id.* (quoting *United States v. James*, 257 F.3d 1173, 1178 (10th Cir. 2001) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).[5] A defendant "seeking discovery need not establish a prima facie case" of selective enforcement, but he must still "satisfy a 'rigorous standard.'" *Id.* (quoting *Armstrong*, 517 U.S. at 468). To satisfy this rigorous standard and secure the right to *conduct* discovery, defendant "must produce 'some evidence' of both discriminatory effect and discriminatory intent." *Id.* (quoting *Armstrong*, 517 U.S. at 470); *see also James*, 257 F.3d at 1178. At the hearing in this case, defendant produced some evidence of discriminatory effect, but he adduced no evidence of discriminatory intent.

---

[5] The Circuit explains the necessity of this significant barrier: "Executive-branch officials possess broad discretion in determining when to make a traffic stop or an arrest. Judicial interference with law-enforcement discretion might 'induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws,' such as by directing law-enforcement resources away from minority neighborhoods. Accordingly, the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, 'a demanding one.'" *Alcaraz-Arellano*, 441 F.3d at 1264 (quoting *Marshall*, 345 F.3d at 1167).

Thus, defendant has failed to make the showing necessary for the court to grant additional discovery for his selective enforcement claim.

This court has recognized that statistical evidence can suffice to establish discriminatory effect in some cases. *See, e.g.*, *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1187–92 (D. Kan. 2003) (statistical study showing sufficient to establish discriminatory effect, but not discriminatory intent); *United States v. Duque-Nava*, 315 F. Supp. 2d 1144, 1156–60 (D. Kan. 2004) (statistical study contrasting deputy's stops by race sufficed to establish discriminatory effect element of race-based selective enforcement but held same evidence insufficient to establish direct evidence of discriminatory motive). And our Circuit has explained that a defendant can satisfy the discriminatory effect prong by providing statistical evidence that addresses whether the defendant's "particular group was treated differently than a similarly-situated group." *James*, 257 F.3d at 1179. The court assumes, without deciding, that Professor Epp's study and testimony at the evidentiary hearing could supply some evidence of discriminatory effect. But no matter the outcome of the discriminatory effect issue, defendant has failed to make the requisite showing of discriminatory intent.

To prevail on the discriminatory intent prong, "a defendant must prove that the government's enforcement of traffic laws against him 'was invidious or in bad faith and was based on impermissible considerations such as . . . the desire to prevent the exercise of constitutional rights.'" *Mesa-Roche*, 288 F. Supp. 2d at 1192 (quoting *United States v. Salazar*, 720 F.2d 1482, 1487 (10th Cir. 1983)). Discriminatory intent requires that the officer took "'a particular course of action at least in part "because of," . . . its adverse effects upon an identifiable group.'" *Id.* (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)). Important here, to "establish discriminatory intent, the defendant must produce some evidence tending to

show that the law enforcement officer acted with discriminatory purpose *specific to his own case* and must support an inference that racial considerations played a part in his treatment." *Id.* (emphasis added).

The "his own case" requirement is where Mr. Jones failed. He failed utterly to produce evidence of discrimination specific to his own case. He offered no evidence tending to show that Officer DeLoux acted with a discriminatory purpose, or that race played a part in Officer DeLoux's decision to initiate a traffic stop of the defendant. Officer DeLoux denied that he stopped defendant because he was Black. In fact, Officer DeLoux testified credibly that he didn't even know the race of the driver when he decided to initiate a stop of Mr. Jones's car. In fact, he testified credibly that he couldn't even discern how many people were inside the car when he decided to initiate the stop. The officer explained that he first learned the driver's race when defendant started to emerge from his car. The court finds this testimony credible because it comports with the video evidence from Officer DeLoux's dashboard camera. It shows the officer approaching Mr. Jones's car from behind, about two o'clock a.m., when it was, predictably, dark outside. This video shows that most of this traffic encounter occurs at a distance and the officer's car didn't get close to Mr. Jones's car until both cars had turned into an unlighted apartment complex parking lot.[6] Also, testimony established the car driven by Mr. Jones had tinted windows. The video confirms as much. And while Officer DeLoux couldn't recall if he had passed Mr. Jones's car before he began following it, the court is unpersuaded that this unknown fact offsets the officer's testimony. The court finds no plausible reason to believe Officer DeLoux observed defendant's race or ethnicity, let alone pulled him over because of it.

---

[6]     Video from the officer's dashboard camera shows the apartment complex parking lot. It had no streetlamps or overhead lights, but there were some lights illuminating the outdoor staircases and balconies of the apartment buildings. Govt. Ex. 1.

A defendant may also offer circumstantial evidence to show discriminatory intent or motive.  An "officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) (reversing summary judgment against equal protection claim where record contained evidence that defendant didn't commit the traffic violation officer stopped him for, officer ascertained defendant's race before the stop, officer made repeated accusations that defendant "was on crack" with no apparent basis, officer noted defendant's race in his report, and defendant presented evidence of extensive alleged misconduct by the officer—including his former police chief stating that this officer had failed "to treat people fairly and equally under the law.")

But here, defendant has neither direct evidence nor circumstantial evidence tending to establish discriminatory intent or motive.  And the court declines "to do that which higher courts have already refused to do, infer discriminatory intent from the statistical evidence." *Mesa-Roche*, 288 F. Supp. 2d at 1193.  Defendant's entire discriminatory motive argument rests on the possibility that Officer DeLoux might have seen Mr. Jones in his car before the traffic stop (and thus ascertained his race) if the two drivers passed one another, driving in opposite directions, or if Mr. Jones initially drove past Officer DeLoux.  Theoretically, the evidence permits this possibility because Officer DeLoux doesn't recall the initial position of his patrol car (whether in front or behind Mr. Jones) before he started following Mr. Jones, some five years ago.  The court finds the officer's testimony acknowledging this possibility credible.[7]

---

[7]      In part, the court finds Officer DeLoux's testimony credible because he readily conceded that he didn't remember things he didn't actually remember.  An officer trying to conceal a discriminatory practice, like the one attributed to Officer DeLoux, likely would have testified with certainty that he didn't pass Mr. Jones (or pull up next to his car) because such testimony would preclude defendant's

But even if the cars had passed one another—as defendant theorizes might have happened—it wouldn't change the analysis.  At most, Officer DeLoux might have passed defendant's car and its tinted windows at 2:06 a.m.  Officer DeLoux testified that he followed Mr. Jones because Mr. Jones drove the only car out on the streets of Lenexa, Kansas at two in the morning on a weeknight.  He pulled over Mr. Jones when he couldn't read his license plate.  Officer DeLoux pulled Mr. Jones over for a traffic violation—a traffic violation that the evidence shows he committed.  Defendant has received discovery about Officer DeLoux's training on biased policing, and all investigations or complaints about Officer DeLoux because of allegedly discriminatory practices.  Defendant also had access to patrol car and body camera footage of the entire encounter between Mr. Jones and Officer DeLoux.  Even with this information, defendant couldn't identify any evidence—direct or circumstantial—that Officer DeLoux acted with discriminatory intent.  Instead, defendant asks the court to conclude based on "the general statistics regarding Lenexa's policing practices in 2017, of which Officer DeLoux contributed to" and Professor Epp's testimony about a high "likelihood of requested information supporting [defendant's] position" to order more discovery.  Doc. 66 at 13–14.

Defendant simply presented no evidence of discrimination in addition to Professor Epp's study.  The study alone isn't enough.  Professor Epp hypothesized that records of Officer DeLoux's stops from March 2016 to March 2018 would reveal a pattern of racial disparity based on his own and other's studies.  Professor Epp also opined that Officer DeLoux could've used Mr. Jones's car—an older, domestic luxury vehicle—as a proxy for his race.  But Professor Epp relied on statistics (showing that officers stopped older, domestic luxury cars at higher rates) and general social science literature (that more Black drivers drive those cars) to support his proxy

theory that the officer knew the driver's race.  But Officer DeLoux didn't contrive such memory even though his cross-examination provided several opportunities to do so.

theory.  Professor Epp didn't base either hypothesis on anything particular to Officer DeLoux from the officer's testimony, the records defendant has received already, or from any footage or report of Officer DeLoux's stop of Mr. Jones.  As our court has explained, "in the context of constitutional claims under the Equal Protection Clause, the proponent cannot rely solely on statistical evidence as he may rely [on] to show discriminatory effect or impact."  *Mesa-Roche*, 288 F. Supp. 2d at 1193–94.  For these reasons, the court finds defendant has failed to show any evidence of discriminatory motive, and thus the court denies his request for additional discovery on his selective enforcement claim.

### III.    Conclusion

For reasons explained above, the court denies Mr. Jones's Motion to Suppress (Doc. 34) and Motion for Additional Discovery (Doc. 36).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Maurice T. Jones's Motion to Suppress (Doc. 34) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Maurice T. Jones's Motion for Additional Discovery (Doc. 36) is denied.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2023, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**