## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MAURICE T. JONES,

      Defendant.

Case No. 21-20055-01-DDC

## MEMORANDUM AND ORDER

Defendant Maurice T. Jones has filed a second Motion to Suppress (Doc. 72).  The government has filed a Response (Doc. 73).  After hearing evidence on June 30, 2023, and hearing the arguments, the court denies Mr. Jones's second Motion to Suppress (Doc. 72).

### I.      Background and Controlling Facts

The court first recites a short summary of factual findings from an earlier evidentiary hearing in this case.[1]  Then, the court makes factual findings relevant to this second Motion to Suppress from the evidence presented at the June 30 hearing.[2]

---

[1]      On February 15, 2023, the court conducted an evidentiary hearing where the parties presented evidence relevant to both suppression and additional discovery motions.  Based on the evidence presented, the court denied Mr. Jones's first Motion to Suppress and Motion for Additional Discovery.  Doc. 68.  The parties agreed that the court could use the factual background from the earlier evidentiary hearing to inform its analysis here.  For the entire factual record, *see* Doc. 68 at 2–9.

[2]      At the hearing, photographs of the apartment buildings and parking lots were admitted as Government Exhibits 1–16.  ATF Agent Hegarty testified as a witness for the government—he photographed the apartment complex where officers arrested defendant and testified about these photographs at the hearing.  Cherise Farr, defendant's then-girlfriend and owner of the searched car, testified as a witness for defendant.

### *The Traffic Stop*

On November 27, 2017, at 2:06 a.m. Lenexa, Kansas Police Department Officer Matthew DeLoux pulled over defendant Maurice T. Jones after he observed Mr. Jones's obscured license plate.  Officer DeLoux followed the car as it turned off Quivira Road onto 77th Terrace in Lenexa, Kansas.  He couldn't read the license plate from within 50 feet of the car because, as he observed:  one license plate light wasn't working, and a clear cover reduced the plate's visibility.  From 77th Terrace, Officer DeLoux followed Mr. Jones's car into the lot for an apartment complex.

After following the car into the parking lot of the apartment complex, Officer DeLoux turned on his lights and pulled over Mr. Jones.  Mr. Jones pulled into a parking spot, then got out of the car, locked it, and walked away—behavior that Officer DeLoux found unusual.  As Mr. Jones opened the door to exit his vehicle, Officer DeLoux smelled an odor of burnt marijuana.  Officer DeLoux approached Mr. Jones and asked him to get back into his car.  Mr. Jones did so.

After Officer DeLoux formed the belief that Mr. Jones had provided false information about his identity, he asked Mr. Jones to place his keys and phone in the center cupholder and get out of the car.  Mr. Jones complied.  Officer DeLoux handcuffed him, patted him down, and detained him in the patrol car.  Another officer arrived on scene, and the two officers then searched the car for the marijuana Officer DeLoux had smelled.  This search discovered a Glock handgun inside the car, and a black backpack holding ammunition and drug paraphernalia.

### *The Apartment Complex*

Mr. Jones argues that when he pulled into the parking spot, he was within the curtilage of his home—a classification that would provide enhanced Fourth Amendment protection.  The following facts are relevant to this curtilage argument.

Mr. Jones's girlfriend at the time, Cherise Farr, lived at The Reserve Apartments—an apartment complex situated at West 77th Terrace and Quivira Road, in Lenexa, Kansas.  In November 2017, she had lived there for a few months and dated Mr. Jones for around a year.  He often spent the night at her apartment; she estimated about three to four times a week, if not more.  The night of November 27, 2017, he drove her car and she expected him to return to spend the night—a typical routine—because she needed her car to drive to work in the morning.

Three buildings comprise The Reserve Apartments complex.  Ex. 1.  Quivira Road runs north/south and lies to the east of the complex; 77th Terrace runs east/west through the complex. Exhibit 1 shows the complex from a bird's eye view:[3]



Figure 1: Overall of stop location

Building 1, Building 3, and a parking lot between the buildings sit to the north of 77th Terrace and Building 2 sits just south of 77th Terrace.  A row of parking spots sits directly to the

---

[3]      The white text boxes—that label the buildings "1, 2, and 3" and provide the cardinal directions around the border—are the court's own markup.  The testimony at the June 30 evidentiary hearing informed these additions to the exhibit.

north in front of Building 2. And just north of the parking lot separating Buildings 1 and 3, a fence divides the apartment complex from a group of homes.

In November 2017, Ms. Farr lived in Building 2. She didn't have a designated parking spot at the complex. The parking lot had a few spots with "VIP parking" signs, *see* Ex. 15, but otherwise none of the spots were marked to indicate that they belonged to specific tenants. So, Ms. Farr typically parked her car either directly in front of her building—Building 2—or in the parking lot across 77th Terrace. The night of the traffic stop, Mr. Jones parked the car in the northwest corner of the complex's parking lot, in front of Building 3.

There's no barrier restricting people from parking in this parking lot—no gate, or other boundary. ATF Agent John Hegarty testified that he didn't observe any mechanism that would allow tenants to exclude non-residents from parking in the lot. He also testified that he believed the parking lot consisted of about 200 square feet. And he estimated that, on the night at issue here, Mr. Jones parked about 150 feet away from Ms. Farr's apartment—about as far away as possible within the apartment complex's parking lot.

## II.    Analysis

Mr. Jones's second Motion to Suppress (Doc. 72) asks the court to suppress the evidence secured from a warrantless search of the car following the traffic stop—this time on the theory that he parked the car on his apartment's curtilage. The government opposes this request. First, the government argues that Mr. Jones lacks standing to challenge the search because he didn't live at the apartment complex. Next, the government argues that the court shouldn't suppress the evidence because the apartment complex's parking lot doesn't qualify as curtilage, and thus Mr. Jones lacked a reasonable expectation of privacy in the parking lot. The court addresses standing first, then turns to each party's arguments on the merits.

### A.  Standing

The government argues that Mr. Jones lacks standing to challenge this search under a curtilage theory because he didn't live in the apartment complex.  During the evidentiary hearing, the government asked the court to take judicial notice of a Pretrial Services Report (PSR) providing a Kansas City, Missouri address as Mr. Jones's permanent address as of January 1, 2012.[4]  The government contends that the "'one who seeks to challenge the legality of a search [must] establish, that he himself was the victim of an invasion of privacy[,]'" *United States v. Salvucci*, 448 U.S. 83, 86 (1980) (quoting *Jones v. United States*, 362 U.S. 257, 261 (1960)), and "a defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search[,]" *United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009).  That's true.

But even if Mr. Jones maintained another permanent residence, he still can have standing as an overnight guest at his girlfriend's apartment.  *See Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) (concluding "that [defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable").  The record shows that Mr. Jones treated Ms. Farr's apartment as a home.  On average, he spent more nights a week there than elsewhere.  That's more than enough to establish that he had an expectation of privacy in the home that society would recognize as reasonable.  Thus, the court concludes that Mr. Jones has standing to make the curtilage argument, and now turns to the merits of that issue.

---

[4]     During the June 30 hearing, defendant objected to the use of the PSR, but later withdrew this objection in a July 6, 2023 email to the court.  Thus, the court considers the government's proffered information from the PSR.

**B. Fourth Amendment Curtilage**

At the Fourth Amendment's "'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Curtilage—the area "immediately surrounding and associated with the home"—qualifies as "part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984). "This area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Jardines*, 569 U.S. at 7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Generally, curtilage is "'clearly marked'" but even where it's not, the concept "'defining the curtilage' is at any rate familiar enough that it is 'easily understood from our daily experience.'" *Id.* (quoting *Oliver*, 466 U.S. at 182, n.12).

Mr. Jones argues that Officer DeLoux searching his car without a warrant in the apartment complex's parking lot—space he contends is curtilage—violated his Fourth Amendment rights. The government argues that (1) the apartment complex's parking lot doesn't qualify as curtilage and (2) Mr. Jones didn't have a reasonable expectation of privacy in the parking lot. The court addresses these arguments, in turn, below.

**1. Does the apartment complex's parking lot qualify as curtilage under the Fourth Amendment?**

In *United States v. Dunn*, the Supreme Court created a four-factor test for resolving curtilage questions. 480 U.S. 294, 301–03 (1987). It instructs courts to analyze: 1. "the proximity of the area claimed to be curtilage to the home," 2. "whether the area is included within an enclosure surrounding the home," 3. "the nature of the uses to which the area is put," and 4. "the steps taken by the resident to protect the area from observation by people passing

by." *Id.* at 301; *see also Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010) (applying

same four factors).  As the Tenth Circuit explains:

> These factors are not a "finely tuned formula," but "are useful analytical tools only
> to the degree that, in any given case, they bear upon the centrally relevant
> consideration—whether the area in question is so intimately tied to the home itself
> that it should be placed under the home's 'umbrella' of Fourth Amendment
> protection."

*United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir. 2006) (quoting *Dunn*, 480 U.S. at 301).

Mr. Jones argues that these four factors support a finding that the apartment's parking lot

qualifies as curtilage.  The government claims these four factors cut the other way.  The court

agrees with the government.  All four *Dunn* factors—especially factors (two) (enclosure) and

(four) (shielding from public view)—weigh against any finding that the parking lot falls within

the home's curtilage.

*First*, the parking lot is immediately adjacent to two of the buildings forming the complex

(Buildings 1 and 3), but it's across the street from Building 2—where Mr. Jones resided.  Mr.

Jones argues that the proximity factor suggests the parking lot falls within the apartment's

curtilage because it's within 50 feet of the apartment building.  But a parking lot across the street

isn't immediately adjacent to his home.  *See Cousins*, 455 F.3d at 1122; *Dunn*, 480 U.S. at 301–

02.  Thus, this factor suggests the area doesn't qualify as curtilage.

*Second*, the parking lot isn't enclosed.  Mr. Jones argues that the following boundaries

partially enclose the lot:  a man-made barrier and tree line lining the south boundary, a fence on

the north, and apartment buildings on the east and west.  But the parking lot is open, accessible,

and entirely visible from a public street.  Buildings on two sides and a fence on the third doesn't

amount to the type of "enclosure"—partial or otherwise—that qualifies as curtilage.  *See*

*Cousins*, 455 F.3d at 1122 (holding that the enclosure factor weighed against finding curtilage

when "[t]he sideyard was enclosed on three sides:  (1) on the east by an exterior wall of the house; (2) on the north by the gate door; and (3) on the west by a fence" but the unenclosed side was a "paved sidewalk"); *cf. United States v. Jenkins*, 124 F.3d 768 (6th Cir. 1997) (concluding partially enclosed area *was* curtilage where the yard was "enclosed on three sides by a wire fence, making it impossible for someone to enter the yard from the fields without using the gate or climbing over the fence" and "[e]ntry from the remaining side, although not completely barred, [was] partially obstructed by the house").  This factor weighs strongly against a finding of curtilage.

*Third*, both parties speculate that residents of the apartment complex use the parking lot for various activities.  Mr. Jones's brief suggests that residents could use the parking lot "like a fenced-in backyard or porch of a single-family house" for activities like "cooking dinner, practicing basketball handling skills, and sunbathing."  Doc. 72 at 6.  The government suggests that "it appears that tenants from any of the three buildings surrounding the parking lot are free to use it for parking, grilling out, playing yard games, [etc.]."  Doc. 73 at 6.  But the court heard no evidence suggesting that anyone used the parking lot for "intimate activities of the home." *See Dunn*, 480 U.S. at 302; *see also Cousins*, 455 F.3d at 1123 (evaluating this third factor, our Circuit couldn't find "that gardening was a primary or even significant use of" a home's sideyard because "the presence of the electric meter and paved walkway belie any claim that the sideyard was intended as a private space").  The openness of the area to a public street and sidewalk, again, thwart any claim that Mr. Jones—or any tenant, for that matter—used or intended to use the lot as a private space for any type of activity.  *See Rieck v. Jensen*, 651 F.3d 1188, 1193 (10th Cir. 2011) ("[A] driveway abutting and clearly visible from a public highway is not a suitable setting for intimate activities associated with a home.").

*Fourth*, nothing shields the parking lot from public view.  Mr. Jones contends that the complex's owner erected barriers—*i.e.*, the fence on the north side and the trees on the south side—"to secure privacy for tenants of the apartment complex outside of the apartments themselves."  Doc. 72 at 7.  But the entire parking lot is visible from a public street, *i.e.*, 77th Terrace.  The parking lot isn't gated, and the complex has no mechanism to direct tenants where to park, or to prevent non-tenants from parking there.  Thus, this factor also weighs against finding curtilage.  *See Rieck*, 651 F.3d at 1193–94 (finding a driveway near the home's gate didn't fall within the curtilage of the home where the gate didn't obstruct the driveway from public view, and "although trees apparently blocked the view of the house and much of the property, they did not block the area in question from observation by those on the public road").  In sum, all four factors weigh against finding curtilage.

Mr. Jones argues that a 2018 Supreme Court decision—*Collins v. Virginia*, 138 S. Ct. 1663 (2018)—helps his case.  In *Collins*, the Supreme Court held that the Fourth Amendment's automobile exception doesn't permit warrantless entry of the home's curtilage.  *Id.* at 1670–71.  Before reaching that conclusion, the *Collins* Court had to decide "whether the part of the driveway where Collins' motorcycle was parked and subsequently searched [was] curtilage."  *Id.* at 1670.  The Court described that part of the driveway this way:

> According to photographs in the record, the driveway runs alongside the front lawn and up a few yards past the front perimeter of the house.  The top portion of the driveway that sits behind the front perimeter of the house is enclosed on two sides by a brick wall about the height of a car and on a third side by the house.  A side door provides direct access between this partially enclosed section of the driveway and the house.  A visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the enclosure and instead proceed up a set of steps leading to the front porch.  When [the officer] searched the motorcycle, it was parked inside this partially enclosed top portion of the driveway that abuts the house.

*Id.* at 1670–71.  The Court concluded that "[j]ust like the front porch, side garden, or area outside the front window," the driveway where the officer searched the motorcycle qualified as curtilage. *Id.* at 1671 (quotation cleaned up).

Mr. Jones argues that *Collins* "rejected the idea that the quality of Fourth Amendment protection should be tied to a person's financial ability to afford garage."[5]  *See* Doc. 72 at 7.  But the Court did so in the context of holding that the ability to observe things inside curtilage doesn't amount to a right to enter curtilage; and so "a parking patio or carport into which an officer can see from the street is no less entitled to protection from trespass and a warrantless search than a fully enclosed garage."  *Collins*, 138 S. Ct. at 1675.

Important factual distinctions exist between *Collins* and this case.  Here, Officer DeLoux first encountered Mr. Jones driving on public streets, and approached the purported curtilage, *i.e.*, the parking lot, only after Mr. Jones turned into the lot.  *See Collins*, 138 S. Ct. at 1674 (distinguishing a case where "the officers . . . first encountered the vehicle when it was being driven on public streets, [and] approached the curtilage of the home only when the driver turned into the garage").[6]  And Officer DeLoux witnessed the traffic violation while Mr. Jones drove on

---

[5]     *Collins* rejected "Virginia's proposed bright-line rule"—that the automobile exception could justify the warrantless search of a vehicle on a home's curtilage, as long as the vehicle was outside of a structure—because that rule "would grant constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage." *Collins*, 138 S. Ct. at 1675 (citing *United States v. Ross*, 456 U.S. 798, 822 (1982) ("[T]he most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion")).

[6]     *Collins* distinguished an earlier opinion—*Scher v. United States*, 305 U.S. 251 (1938)—where the Court held a warrantless search of a car on curtilage didn't violate the Fourth Amendment.  In *Scher*, officers received a tip about a bootlegger; they followed the suspect from the transport spot, tailing his car until it "turned into a garage a few feet back of his residence and within the curtilage." *Id.* at 253.  Then the officers arrested him and searched the car while it was in the garage. *Id.*  Although the officer didn't have a search warrant, the Court upheld his actions as reasonable. *Id.* at 255.  The *Collins* court noted a few key differences between the two cases—(1) "[T]he officers in *Scher* first encountered the vehicle when it was being driven on public streets [and] approached the curtilage of the home only when the

Quivira Road, then on 77th Terrace—both public streets—so, Officer Deloux likely could've stopped Mr. Jones before he entered the complex's parking lot.  *See id.* (distinguishing case where "the 'officers properly could have stopped' and searched the car 'just before [petitioner] entered the garage'" (quoting *Scher*, 305 U.S., at 254–255)).

   In sum, the court concludes that the apartment complex's parking lot doesn't fall within the curtilage of Mr. Jones's apartment.  Thus, any argument to suppress this evidence based on a physical trespass theory fails.  But, as the Supreme Court articulated in *Katz v. United States*, the Fourth Amendment also can protect an individual "even in an area accessible to the public" when that individual justifiably relied on an expectation of privacy.  389 U.S. 347, 352–53 (1967).  Outside the scope of protections moored in property rights, the "capacity to claim the protection of the [Fourth] Amendment depends . . . upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."  *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968).  The court thus addresses, next, whether Mr. Jones had a reasonable expectation of privacy in the apartment complex's parking lot.  It concludes he didn't.

---

driver turned into the garage" *Collins*, 138 S. Ct. at 1674; (2) The "officers properly could have stopped" and searched the car "just before [petitioner] entered the garage" *Id.* (internal quotation marks omitted) (quoting *Scher*, 305 U.S. at 254–255); and (3) The officers didn't lose their ability to stop and search the car when it entered "the open garage closely followed by the observing officer" because "[n]o search was made of the garage." *Id.* (internal quotation marks omitted) (quoting *Scher*, 305 U.S. at 255).

   The court doesn't suggest that it's applying *Scher* as precedent to support its holding here.  As *Collins* described—the *Scher* decision is "best regarded as a factbound one" and "case specific and imprecise, sounding in multiple doctrines, particularly, and perhaps most appropriately, hot pursuit." *Id.* But the discussion of *Scher* provides useful context here because it helps illuminate important differences between the *Collins* facts and the facts presented here.

2.  **Did Mr. Jones have a reasonable expectation of privacy in the apartment complex's parking lot?**

 "A defendant invoking the protection of the Fourth Amendment 'must demonstrate that he *personally* has an expectation of privacy in the place searched, and that his expectation is reasonable.'"  *United States v. Maestas*, 639 F.3d 1032, 1035 (10th Cir. 2011) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)) (affirming district court's denial of motion to suppress where overnight guest at triplex didn't have reasonable expectation of privacy in the garbage storage area used by at least two other tenants in triplex and accessible by landlord).  "In order to meet this burden, 'the defendant must show that he had a subjective expectation of privacy in the premises searched and that "society is prepared to recognize that expectation as reasonable."'"  *Id.* (quoting *United States v. Higgins*, 282 F.3d 1261, 1270 (10th Cir. 2002) (quoting *United States v. Conway*, 73 F.3d 975, 979 (10th Cir.1995))).

In *Maestas*, our Circuit explained that most of the other circuits "have found that 'shared' or 'common' areas in apartment complexes or multi-unit dwellings, such as hallways, entryways, and basements, are not areas over which an individual tenant can have a reasonable expectation of privacy."  639 F.3d at 1038 (first citing *United States v. Miravalles*, 280 F.3d 1328, 1333 (11th Cir. 2002) (holding that "tenants in a large, high-rise apartment building, the front door of which has an undependable lock that was inoperable on the day in question, [do not] have a reasonable expectation of privacy in the common areas of their building"); then citing *United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (holding that tenant in apartment complex had "no reasonable expectation of privacy in the common areas of the building"); then citing *United States v. Acosta*, 965 F.2d 1248, 1252 (3d Cir. 1992) (holding that defendant didn't have a reasonable expectation of privacy in shared hallway or backyard of a multi-unit apartment building); and then citing *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (holding that

tenant didn't "have a reasonable expectation of privacy in the hallway of the apartment building")).  Here, the record shows that tenants from all three buildings in the complex shared the parking lot.  Mr. Jones can't have a reasonable expectation of privacy over the parking lot of the apartment complex—a shared common area among tenants.

Mr. Jones argues that *Maestas* predates the Supreme Court's *Collins v. Virginia*, and its reasoning won't stand after *Collins*.  *See* Doc. 72 at 8–9.  But this argument overstates the holding in *Collins*—one which, at its core, focuses on the limits of the automobile exception. *Collins* doesn't expand the definition of curtilage; nor does it expand the areas where tenants of an apartment complex may have a reasonable expectation of privacy.  The Tenth Circuit's reasoning in *Maestas* withstands the Supreme Court's holding in *Collins*, and, as examined below, post-*Collins* decisions from the Second and Sixth Circuit support this conclusion.

In a recent case, the Second Circuit held that a petitioner "had no legitimate expectation of privacy in a parking lot" because it "was a common area accessible to other tenants of [the building] and to tenants of a multi-family building next door," so, he "could not reasonably expect that it should be treated as part of his private home."  *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018).  The Second Circuit explained that the "[*Collins*] decision, however, ha[d] no effect on [petitioner's] appeal, which fail[ed] because the driveway in which [his] vehicle was parked was the *shared* driveway of tenants in two multi-family buildings and was not within the curtilage of [his] private home."  *Id.*  The same reasoning applies here, and with equal force.

Mr. Jones had no legitimate expectation of privacy in the apartment complex parking lot—an area accessible to tenants of the complex and accessible from a public road.  *See also United States v. Coleman*, 923 F.3d 450, 456 (6th Cir. 2019) (applying *Dunn*'s factors, and concluding that petitioner's driveway wasn't curtilage when it was "sitting in front of the

residence," "not enclosed by anything," and the "driveway was in fact shared with other families and other condo residents frequently walked past cars parked in front of condo units."). In sum, the court concludes that Mr. Jones couldn't reasonably expect that an officer should've treated the parking lot as part of his home after pulling him over.

### III.    Conclusion

The apartment complex's shared parking lot—one that's visible and accessible from a public road—doesn't qualify as curtilage, and Mr. Jones didn't have a reasonable expectation of privacy in that parking lot. For these reasons, the court denies Mr. Jones's second Motion to Suppress (Doc. 72).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Maurice T. Jones's second Motion to Suppress (Doc. 72) is denied.

**IT IS SO ORDERED.**

**Dated this 31st day of July, 2023, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

14