IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**

**MAURICE T. JONES (01),**

        **Defendant.**

**Case No. 21-20055-01-DDC**

**MEMORANDUM AND ORDER**

This matter comes before the court on defendant Maurice T. Jones's Motion to Dismiss (Doc. 35). Mr. Jones asks the court to dismiss the government's indictment against him, arguing that the indictment stems from a racially motivated traffic stop in which Officer Matthew DeLoux violated Mr. Jones's Fifth Amendment right to Equal Protection. The government disagrees. It argues that Officer DeLoux exhibited no discriminatory bias, that he merely enforced a state law and local ordinance that bans license plate covers obscuring visibility.

A party may bring a pre-trial motion to dismiss an indictment based on selective law enforcement if he proves that (1) the pertinent officer acted with a discriminatory purpose and (2) the officer's action had a discriminatory effect. Mr. Jones has established neither. For reasons explained below, the court denies Mr. Jones's Motion to Dismiss (Doc. 35).

The court recounts, below, pertinent factual background. These facts come from the evidence presented at the February 15, 2023 and June 30, 2023 hearings, unless otherwise noted.[1]

---

[1] At the February 15 hearing, Officer Matthew DeLoux's patrol car's dash camera footage was admitted as government's Exhibit 1. Officer DeLoux also testified. Professor Charles R. Epp testified as an expert witness on behalf of defendant. An investigator from the Office of the Federal Public Defender,

**I.     Factual Background**

On November 27, 2017, Lenexa Police Department Officer Matthew DeLoux pulled over defendant Maurice T. Jones after Officer DeLoux observed Mr. Jones's obscured license plate. From the stop and subsequent search, Officer DeLoux discovered contraband that led to Mr. Jones's arrest and indictment.

**A.     The Traffic Stop**

On November 27, 2017, at 2:06 a.m., Lenexa, Kansas Police Department Officer Matthew DeLoux pulled over a car driven by defendant Maurice T. Jones after he saw an obscured license plate. An obscured license plate violates Lenexa Ordinance § 126.1 and Kan. Stat. Ann. § 8-15,110. Officer DeLoux followed the car as it turned off Quivira Road onto 77th Terrace in Lenexa, Kansas—a suburb in the Kansas City metropolitan area. Officer DeLoux couldn't read the license plate from within 50 feet of the car because, as he observed, one of the lights illuminating the license plate wasn't working, and a weathered clear cover further reduced the plate's visibility.[2] From 77th Terrace, Officer DeLoux followed Mr. Jones's car into the parking lot for a small apartment complex.

---

Zay Thompson, and defendant's then-girlfriend and owner of the searched car, Cherise Farr, also testified as witnesses for defendant.

[2]     Lenexa Ordinance § 126.1 makes it unlawful for "any person to attach and display on any vehicle a license plate . . . which is covered, in whole or in part, with any clear or opaque material or any other plastic-like material that affects the plate's visibility or reflectivity." Lenexa Ord. § 126.1; *see also* Kan. Stat. Ann. § 8-15,110(a) (prohibiting the same).

Officer DeLoux testified that between government's Exhibits 14 and 15 (screenshots from his patrol car's dashcam), he estimated that he was about 50 feet behind the vehicle, and he could not read the license plate.

2

B.  **The Search**

After following the car into the apartment complex parking lot, Officer DeLoux turned on his emergency lights and stopped the car driven by Mr. Jones.[3] Mr. Jones pulled into a parking spot, then got out of the car, locked it, and walked away—behavior that Officer DeLoux found unusual. As Mr. Jones opened the door to exit his vehicle, Officer DeLoux smelled the odor of burnt marijuana. Officer DeLoux approached Mr. Jones and asked him to return to his car. Mr. Jones complied. Officer DeLoux then asked Mr. Jones for his name, driver's license, registration, and proof of insurance. Mr. Jones twice gave Officer DeLoux false names, and one of the two names was subject to several arrest warrants. Officer DeLoux formed the belief that Mr. Jones had provided false information about his identity, so he asked Mr. Jones to place his keys and phone in the cupholder of the front seat's center console and get out of the car. Again, Mr. Jones complied. Officer DeLoux handcuffed him, patted him down for weapons, and detained him in his patrol car. Another officer arrived on scene, and the two officers then searched the car for the marijuana Officer DeLoux had smelled. This search discovered a Glock handgun inside the car, and a black backpack holding a scale, plastic baggies, marijuana, and cocaine.

The government has charged Mr. Jones with one count of Possession with Intent to Distribute Cocaine; one count of the Use, Carry, and Possession of a Firearm in Furtherance of a

---

[3]   When asked about government's Exhibit 20 (another still frame from his dash cam—taken when his police cruiser was closer to the car than Exhibits 14 and 15), Officer DeLoux testified that he still couldn't read the license plate. When defense counsel asked about Exhibit 21 (the closest, still frame harvested from the dash cam's video—within 8 to 10 feet of the car), Officer DeLoux testified that he was no longer attempting to read, or even concerned with reading, the license plate at that point during his encounter. Instead, the officer explained, he was concerned about how many occupants would step out of the car he had followed and he didn't yet know the identity or intent of the driver.

3

Drug Trafficking Crime; and one count of Felon in Possession of a Firearm and Ammunition. Doc. 1 (Indictment).

## C. Testimony Relevant to the Selective Enforcement Claim

At the February 15 hearing, the court received evidence relevant to defendant's selective enforcement claim, and his motion to discover additional evidence to support that claim. This evidence falls into two distinct categories. *First*, the court heard evidence from Officer DeLoux about the night at issue and his motivation for initiating the traffic stop. *Second*, the court heard evidence from defendant's expert witness, Professor Charles Epp. He testified about policing and race. The court describes the relevant facts established in their testimony, below.

### 1. Officer DeLoux's Testimony

Officer DeLoux was patrolling the area of 79th Street and Quivira Road when he first saw Mr. Jones's car. He testified that he couldn't recall specifically where he was located when he first saw the car. Also, he couldn't remember the direction he was travelling before he got behind the car. Officer DeLoux agreed with defense counsel it was possible—based on the time stamps from his dash cam showing that he had to accelerate to catch up to Mr. Jones—that he had passed Mr. Jones on Quivira Road, or that he was on the same side of the road as Mr. Jones and saw him as he drove past. Officer DeLoux also testified that his car's acceleration could mean that he travelled at a distance behind Mr. Jones and thus needed to speed up—no matter the direction of approach. The testimony didn't answer the question of when Officer DeLoux first encountered Mr. Jones's car.

Asked to explain what it was that drew his attention to Mr. Jones's car that night, Officer DeLoux explained that in Lenexa, at two in the morning on a weeknight, he would get behind any car he encountered on the road and run the license plate to check for outstanding warrants.

He engaged in this kind of investigation because he typically didn't see much traffic on the road at that time of night in Lenexa. The officer recalled that there weren't any other cars driving around the area the night he pulled over Mr. Jones. He testified that he would follow a car at this time of night simply because it was the only car on the road at the time.

Officer DeLoux asserted that he didn't pull Mr. Jones over because of his race. He testified that when his car was within 8 to 10 feet of Mr. Jones's car, he couldn't determine how many people were in the car—let alone the race of anyone in the car. He testified that he didn't determine the race of Mr. Jones until Mr. Jones stopped and got out of his car after parking it in the apartment parking lot. When asked directly if he decided to stop this car because the person inside was White or Black, Officer DeLoux answered no.

Officer DeLoux estimated that he has conducted thousands of traffic stops in his career as a patrol officer. He has conducted other traffic stops because of obstructed or obscured license plates, and some of those stops included cars with clear license plate covers. In his experience, it's very difficult to read license plates through clear covers. He testified that his traffic stop of Mr. Jones was no different than any other stop he has conducted for a suspected license plate obstruction because of a clear cover.

      **2.**      **Professor Epp's Testimony**

The court now summarizes the testimony of defendant's expert witness, Professor Charles Epp. Professor Epp has authored numerous books and articles about policing and racial profiling. He has conducted research about policing and race in the Kansas City area. Professor Epp conducted a study in the Kansas City metro area where he surveyed 2,346 drivers. That study found that drivers in the Kansas City metro experience two different types of police stops: (1) a stop to sanction unsafe driving behavior—a "traffic safety stop;" or (2) a stop to check out

the driver—an "investigatory stop." Professor Epp's study found no significant racial disparity for traffic safety stops, but he did find a significant racial disparity for investigatory stops. This study found that in the Kansas City area, officers stopped Black drivers nearly three times as often as White drivers for investigatory stops. Professor Epp hypothesized that because officers exercise more discretion when conducting investigatory stops, they stop more Black drivers because of their own implicit biases or stereotypes.

The study also found a greater racial disparity in stops occurring in Kansas City's suburbs as compared to the core city. And Professor Epp testified Lenexa fits the description of a Kansas City suburb. He testified that many studies across the United States have replicated his study and reached the same results—racial disparities concentrated in investigatory stops.

Professor Epp testified that, to determine whether Officer DeLoux had stopped Mr. Jones because of his race, it would help to have data about the stops Officer DeLoux has made over a period of several years. Ideally, this information would include the race of the driver for each stop, the reason given for the stop, whether the officer had issued a citation, and whether he had conducted a search after the stop. That data could help to place the traffic stop of Mr. Jones in November 2017 in context, showing how Officer DeLoux has conducted traffic stops over the past few years. To put it simply, defendant's requested discovery sought an answer to this question: Does Officer DeLoux's record show a pattern of over-selecting Black drivers for traffic stops? Professor Epp hypothesized that records for Officer DeLoux's stops from March 2016 to March 2018 would reveal patterns of racial disparity. He based this opinion on past evidence, past results in other locations, and the results of his study about the Kansas City area generally.

6

During Officer DeLoux's time at the Lenexa Police Department, he conducted 2,223 stops. Out of those 2,223 stops, he issued 598 citations. Professor Epp testified that Officer DeLoux's 27% citation rate indicates that he tended to conduct more investigatory stops than the average officer. Based on his research of investigatory stops, Professor Epp opined that an investigatory stop often is based on race.

Finally, Professor Epp testified that the make and the model of a car also could contribute to patterns of racial disparity in investigatory stops. Police officers, he opined, select older domestic luxury cars—such as Cadillacs and Lincolns—at a higher rate than other cars for investigatory stops. Professor Epp opined that social science literature about cultural stereotypes supports an inference that Black people drive older, domestic luxury cars more frequently than White people. Unlike the professor's other opinions, this premise—that Black people are more likely to drive older, domestic luxury cars—wasn't based on data he had collected. Thus, Professor Epp concluded, officers may use car type as a proxy for race, to identify and select Black drivers for investigatory stops. He testified that the car involved in this case's stop—a 2002 Lincoln LS—fits into the proxy category of older, domestic luxury cars.

Next, the court briefly summarizes the relevant procedural posture to provide context and a backdrop for its analysis.

## II.     Procedural Background

Mr. Jones's Motion to Dismiss cannot succeed because it relies on the same evidence that the court has already decided doesn't satisfy Mr. Jones's evidentiary burden. *See* Doc. 68 at 17–23 (1st Mot. Suppress Mem. & Order) (denying Mr. Jones's Motion for Additional Discovery). Mr. Jones contemporaneously filed a Motion for Additional Discovery (Doc. 36) with his Motion to Dismiss, requesting information relevant to the Motion to Dismiss. The court denied

7

Mr. Jones's Motion for Additional Discovery because he didn't meet the threshold burden established by Circuit precedent, *i.e.*, one requiring defendant to produce "'some evidence' of both discriminatory effect and discriminatory intent." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (quoting *United States v. Armstrong*, 517 U.S. 456, 470 (1996)); Doc. 68 at 18 (1st Mot. Suppress Mem. & Order).

Mr. Jones also filed two Motions to Suppress. Doc. 34; Doc. 72. The first one (Doc. 34) sought to suppress evidence found following the traffic stop. Mr. Jones argued that officers had collected the evidence against him during an unreasonable search and seizure. On February 15, 2023, the court conducted an evidentiary hearing where the parties presented evidence relevant to this first suppression motion and the motion seeking additional discovery. The court heard testimony from Officer DeLoux and Professor Charles Epp, recounted above. Doc. 68 at 8–9 (1st Mot. Suppress Mem. & Order). Based on the evidence presented, the court denied Mr. Jones's first Motion to Suppress. The court found that Officer DeLoux reasonably had stopped Mr. Jones and possessed probable cause to search Mr. Jones's car. *Id.* at 13–16. The court also denied Mr. Jones's Motion for Additional Discovery because he had adduced no evidence of discriminatory intent. *Id.* at 18.

Mr. Jones's second Motion to Suppress (Doc. 72), also sought to suppress evidence officers discovered in his vehicle following the traffic stop. This motion contended that because Mr. Jones had parked his car on the curtilage of the apartment complex where he stayed—and because officers lacked a search warrant—officers unreasonably searched and seized evidence from his car. Doc. 82 at 2–3 (2nd Mot. Suppress Mem. & Order). On June 30, 2023, the court heard additional evidence during a second evidentiary hearing on the second Motion to Suppress (Doc. 72). *Id.* at 1. The court held that Mr. Jones didn't have a reasonable expectation of

8

privacy because the apartment complex's shared parking lot wasn't curtilage. *Id.* at 14. It reasoned that the lot was visible and accessible from a public road. *Id.*

Mr. Jones's Motion to Dismiss (Doc. 35) hinged on the court granting the Motion for Additional Discovery (Doc. 36) because Officer DeLoux's traffic stop reports—defendant contends—potentially would've helped Mr. Jones establish discriminatory intent, a necessary element of his Equal Protection Clause violation claim. *Armstrong*, 517 U.S. at 465. Absent additional discovery, the pending Motion to Dismiss relies on the facts in Mr. Jones's second Motion to Suppress (Doc. 72). Given the court's ruling denying Mr. Jones's Motion for Additional Discovery, it concluded the Motion to Dismiss was ripe for ruling and determined that the United States needn't file a response.

Below, the court now assesses Mr. Jones's arguments in support of his Motion to Dismiss. This analysis begins with the governing legal standard.

### III. Legal Standard

Mr. Jones, a Black person, asks the court to dismiss his indictment because Officer DeLoux, a White person, stopped him "based on his race and subject[ed him] to selective enforcement of" Lenexa Ordinance § 126.1 and Kan. Stat. Ann. § 8-15,110, violating his Fifth Amendment right to Equal Protection. Doc. 35 (Mot. Dismiss). The government counters, contending that Officer DeLoux stopped Mr. Jones for a legitimate reason: Mr. Jones's license plate wasn't visible, thus violating Lenexa Ordinance § 126.1 and Kan. Stat. Ann. § 8-15,110. Also, the government contends, Officer DeLoux couldn't have pulled Mr. Jones over based on his race because he didn't know Mr. Jones's race until well after he had decided to stop the car he was driving, *i.e.*, when Mr. Jones got out of his car at the apartment complex.

9

The "Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Specifically, the Fifth Amendment prohibits the federal government from discriminatory law enforcement. *Wayte v. United States*, 470 U.S. 598, 608–09 n.9 (1985). "Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1167 (10th Cir. 2003).

A defendant may move to dismiss based on discriminatory actions by a law enforcement officer or a prosecutor. *See Alcaraz-Arellano*, 441 F.3d at 1264; *see also United States v. Griffith*, 928 F.3d 855, 866–67 (10th Cir. 2019). The standard applying to prosecutors and the one applying to officers share substantial common ground. In its seminal decision in *Armstrong*, the Supreme Court outlined a two-element test a person must establish to prevail on a selective-prosecution claim: the "claimant must demonstrate that the federal prosecutorial policy [1] had a discriminatory effect and [2] that it was motivated by a discriminatory purpose." 517 U.S. at 465 (citation and internal quotations omitted). As our Circuit has explained, a "selective-enforcement claim requires essentially the same showing." *Griffith*, 928 F.3d at 866.

Principles of federalism and separation of powers counsel the court to pause before deciding a selective-prosecution claim. Both the Supreme Court and our Circuit emphasize that both selective prosecution and selective enforcement claims face a "demanding" standard of proof. *Armstrong*, 517 U.S. at 463; *Alcaraz-Arellano*, 441 F.3d at 1264. A "selective prosecution claimant" asks the judiciary, in effect, "to exercise judicial power over a 'special province' of the Executive." *Armstrong*, 517 U.S. at 464. Such judicial review could "chill law

10

enforcement by subjecting the prosecution's motives and decisionmaking to outside inquiry," and thus "may undermine prosecutorial effectiveness." *Id.* at 465 (citation and internal quotation marks omitted). The Tenth Circuit has concluded that "[s]imilar caution is required" for claims of selective law enforcement. *Alcaraz-Arellano*, 441 F.3d at 1264. This is so, the Circuit reasoned, because "[e]xecutive-branch officials possess broad discretion in determining when to make a traffic stop or an arrest." *Id.* (citing *Marshall*, 345 F.3d at 1167). So, bottom line, "the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, 'a demanding one.'" *Id.* at 1267 (quoting *Marshal*, 345 F.3d at 1167).

IV.  **Analysis**

The court now turns to Mr. Jones's arguments. The court evaluates his arguments and decides whether Mr. Jones has satisfied both prongs of the *Armstrong* test, as required for a selective enforcement motion.

A.  **Discriminatory Effect**

A defendant has two options for showing discriminatory effect: he may find a similarly-situated individual or use statistical evidence of similarly-situated individuals. For the first option, a defendant can "make a credible showing that a similarly-situated individual of another race could have been prosecuted for that offense for which the defendant was charged, but was not." *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001) (citing *Armstrong*, 517 U.S. at 465). "In the context of a challenged traffic stop, however, imposing the similarly-situated requirement makes the selective enforcement claim impossible to prove." *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1186 (D. Kan. 2003). The similarly-situated individual requirement "would require the defendant to make a credible showing that a similarly situated individual was *not stopped* by the law enforcement." *Id.* (emphasis in original). Even with

11

additional discovery, a defendant would struggle to make this showing because law enforcement agencies "cannot record any, much less all pertinent information on the dozens, hundreds, or even thousands of motorists who are not stopped within a patrolling officer's given space and time." *Id.* at 1187.  Given these challenges, the "Tenth Circuit has indicated that a defendant can demonstrate discriminatory effect by either showing a similarly situated individual, *or* by relying on statistical evidence." *Id.* (emphasis in original) (citing *Marshall*, 345 F.3d at 1167).  Here, Mr. Jones relies on statistical evidence.

The Supreme Court long has considered statistical evidence in the discrimination context. *See, e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding illegal discrimination violating the Fourteenth Amendment where government denied applications from all 200 Chinese-owned businesses, but 80 other non-Chinese owned businesses were "permitted to carry on the same business under similar conditions").  But, a "defendant cannot satisfy the discriminatory effect prong by providing statistical evidence which simply shows that the challenged government action tends to affect one particular group." *James*, 257 F.3d at 1179.  "Rather, the proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group." *Id.*  Our Circuit provides that statistical evidence in selective enforcement cases must include:

(1) "a reliable measure of the demographics of the relevant population,"

(2) "a means of telling whether the data represent similarly situated individuals," and

(3) "a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population."

*Marshall*, 345 F.3d at 1168 (internal citations omitted); *see also United States v. Alabi*, 597 F. App'x 991, 997 (10th Cir. 2015).

For example, in *Armstrong* the Supreme Court addressed a study concluding that 100% of the crack cocaine cases handled by the Los Angeles Federal Public Defender's office in 1991 had Black defendants.  517 U.S. at 459.  The Court held that this study failed to show discriminatory effect because it didn't identify non-Black people whom the government could've prosecuted for crack cocaine offenses but didn't.  *Id.* at 470.

In *United States v. Mesa-Roche*, Judge Robinson of our court addressed a similar situation to Mr. Jones's case:  a traffic stop based on a state traffic law violation that, defendant argued, was really an improper, racially-motivated stop.  288 F. Supp. 2d at 1176, 1179.  Judge Robinson rejected one set of data offered by the defendant, but found another persuasive.

The defendant proffered statistical evidence that the law enforcement officer in question, Deputy Schneider, "initiated traffic stops that were on average:  56.59% are white motorists; 33.69% are Hispanic motorists; and 9.72% are black motorists."  *Id.* at 1179.  Other officers who patrolled different parts of the county "initiated traffic stops that were on average:  90.27% white motorists; 5.57% Hispanic motorists; and 4.6% black motorists."  *Id.*  Judge Robinson found this comparison data unpersuasive because this difference—33.69% versus 5.57% stops of Hispanic motorists—could come from the different populations that officers encountered.  *Id.*  That is, Deputy Schneider patrolled Interstate 70 "almost exclusively," so "the transient motorist population he encounter[ed] [was] quite different form the population encountered by his fellow officers who patrol in the city and county of Russell, but not on I-70."  *Id.*

In contrast, Judge Robinson concluded that a study about other traffic stops on Interstate 70 provided a better comparison.  This study showed that the Kansas Highway Patrol patrolling Interstate 70 made "traffic stops that [were] on average:  6.8% Hispanic motorists and 5.7% black motorists."  *Id.*  Judge Robinson emphasized the "significant difference in stops that are

13

6.8% Hispanic motorists and stops that are 33.69% Hispanic motorists, which cannot be explained by any significant difference in the transient motorist population encountered by Kansas Highway Patrol troopers" and Deputy Schneider. *Id.* While Judge Robinson acknowledged some problems with the study's methodology, *id.* at 1189, she nonetheless held that the defendant had established discriminatory effect because "the comparison of Deputy Schneider's incidence of stops with the incidence of stops by Kansas Highway Patrol still constitute[d] a strong showing of discriminatory effect." *Id.* at 1190. Judge Robinson's thoughtful analysis demonstrates the kinds of statistical evidence that can—and cannot—show discriminatory effect in the traffic stop context.

Here, Mr. Jones also relies on statistical evidence to support his claim that Officer DeLoux racially discriminated against him. Doc. 35 at 5–6 (Mot. Dismiss). Using statistics from the United States Census Bureau and Lenexa Police Department's 2016–20 FBI report, Mr. Jones compares the racial make-up of Lenexa, Kansas, to the racial make-up of the Lenexa Police Department's reported arrests. *Id.* He concludes that Lenexa police officers arrest Black (or African American) people at 500% the expected rate of arrest given their proportion in the population. *Id.* He further asserts that the Lenexa Police Department's policing patterns "have a discriminatory effect on people of color—including Mr. Jones." *Id.*

This statistical evidence doesn't provide "a means of telling whether the data represent similarly situated individuals[.]" *Marshall*, 345 F.3d at 1168. Instead, Mr. Jones's data addresses a different form of government action than the action challenged by Mr. Jones. His data about the rate at which the Lenexa Police Department *arrests* Black people in Lenexa doesn't represent other individuals who were *pulled over*. Mr. Jones argues that Officer DeLoux discriminated against him based on his race when Officer DeLoux pulled him over, not when

14

Officer DeLoux arrested him. In contrast, the defendant in *Mesa-Roche* proffered traffic stop data specific to the highways that the deputy patrolled. 288 F. Supp. 2d at 1190. This allowed Judge Robinson to compare apples-to-apples, because she could compare the deputy's stop rate of Hispanic drivers with the general stop rate of Hispanic drivers using the same population of motorists. Here, the court can't conduct a similar apples-to-apples comparison. In sum, Mr. Jones also fails to proffer "a point of comparison to the actual incident of crime among different racial or ethnic segments of the population." *Marshall*, 345 F.3d at 1168. He has failed to demonstrate that all drivers of all races use obscured license plates with the same frequency. *See, e.g.*, *Alabi*, 597 F. App'x at 997 (finding defendant failed to demonstrate discriminatory effect with statistical evidence because he "failed to demonstrate drivers of different races speed with the same frequency"); *see also Armstrong*, 517 U.S. at 469 (rejecting presumption that people of all races commit all types of crime with equal frequency). Without any point of comparison, the court can't say whether Mr. Jones and other Black people were treated differently than other groups.

       **B.**     **Discriminatory Purpose**

Because Mr. Jones failed to establish a discriminatory effect, the court "need not address whether the evidence [Mr. Jones] presented satisfied the discriminatory-intent prong." *United States v. Deberry*, 430 F.3d 1294, 1301 (10th Cir. 2005). But out of caution, the court nonetheless addresses the discriminatory purpose prong, the second half of *Armstrong*'s two-part test. The court concludes that, *even if* Mr. Jones had satisfied *Armstrong*'s discriminatory effect prong, he still couldn't prevail because he hasn't satisfied the discriminatory purpose prong of the test.

*Armstrong*'s "discriminatory-purpose element requires a showing that discriminatory intent was a motivating factor in the decision to enforce the criminal law against the defendant." *Alcaraz-Arellano*, 441 F.3d at 1264 (citation and internal quotations omitted). To demonstrate discriminatory purpose, a defendant must show that an officer's discretion in enforcing "traffic laws against him 'was invidious or in bad faith and was based on impermissible considerations such as . . . the desire to prevent the exercise of constitutional rights.'" *Mesa-Roche*, 288 F. Supp. 2d at 1192 (quoting *United States v. Salazar*, F.2d 1482, 1487 (10th Cir. 1983)). The officer must've chosen "a particular course of action at least in part because of, not merely in spite of, its effects upon an identifiable group." *Id.* (citation and internal quotation marks omitted). A defendant can show discriminatory purpose through "either direct or circumstantial evidence." *Deberry*, 430 F.3d at 1299 (citing *Batson v. Kentucky*, 476 U.S. 79, 93 (1986)).

Absent direct evidence of discriminatory treatment, defendants often rely on statistical evidence to prove discriminatory intent. *Chavez v. Ill. State Police*, 251 F.3d 612, 638–40 (7th Cir. 2001). An "officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context." *Marshall*, 345 F.3d at 1168. But "a defendant cannot meet his burden by generic statistical evidence." *Alcaraz-Arellano*, 302 F. Supp. 2d 1217 (D. Kan. 2004) (citing *James*, 257 F.3d at 1179), aff'd, 441 F.3d 1252, 1227 (10th Cir. 2006); *see also Mesa-Roche*, 288 F. Supp. 2d at 1196. To "prevail under the Equal Protection Clause, [defendant] must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292–93 (1987) (emphasis in original). A defendant may struggle to meet *Armstrong*'s "demanding standard" when the defendant can't prove that the officer knew the movant's race before initiating the stop. *Alcaraz-Arellano*, 302 F. Supp. 2d at 1234 ("Without proof of the

16

officer's knowledge of a driver's race, an intent to discriminate against a driver because of his race can rarely, if ever, be shown.").

In the discriminatory purpose analysis, statistical evidence must meet a higher threshold. It's much harder for statistics to show discriminatory purpose than it is for discriminatory effect. *Mesa-Roche*, 288 F. Supp. 2d at 1193–94 ("[I]n the context of constitutional claims under the Equal Protection Clause, the proponent cannot rely solely on statistical evidence as he may rely [on] to show discriminatory effect or impact."). For example, in *Mesa-Roche*, Judge Robinson concluded that a study showed discriminatory effect, but held that the same study failed to establish discriminatory purpose. *Id.* at 1194–95 ("[T]he disparity that establishes discriminatory effect, does not establish that the discriminatory effect of Deputy Schneider's conduct was itself the product of discriminatory intent."). Judge Robinson explained that the study showed a correlation between the race of the motorist and traffic stops, but it failed to show causation. *Id.* at 1195. The study thus failed to show discriminatory purpose because, to "show intent, one must show causality." *Id.*

The court has visited this issue before. In its Memorandum and Order (Doc. 68) denying Mr. Jones's first Motion to Suppress and Request for Additional Discovery, the court closely analyzed whether Mr. Jones had shown discriminatory purpose. It concluded that Mr. Jones adduced no evidence of discriminatory purpose. Doc. 68 at 18, 19 (1st Mot. Suppress Mem. & Order). The court revisits that conclusion here because the same standards apply to Mr. Jones's Motion to Dismiss (Doc. 35). Mr. Jones didn't meet the burden required for additional discovery, and he's adduced no new evidence since. The court again concludes that Mr. Jones failed to carry his burden to show discriminatory purpose. The court explains this conclusion, below, beginning with direct evidence of discrimination.

17

There's no direct evidence that would support an inference that Officer DeLoux pulled Mr. Jones over because of his race. Officer DeLoux testified credibly that he didn't know Mr. Jones's race before deciding to stop Mr. Jones. The tinted windows on Mr. Jones's car and the lighting conditions at 2:00 a.m.—it was dark—support this testimony. And while Officer DeLoux couldn't recall if he had passed Mr. Jones's car before he began following it, the court is unpersuaded that this unknown offsets the officer's testimony. Racial animus thus couldn't have served as a "motivating factor" in Officer DeLoux's decision to enforce the license plate visibility law against Mr. Jones. *Alcaraz-Arellano*, 441 F.3d at 1264; *id.* at 1265 (concluding defendant fails *Armstrong*'s discriminatory purpose prong when the district court found that the officer decided to stop defendant before knowing his ethnicity); *United States v. Montes*, 280 F. App'x 784, 788 (10th Cir. 2008) (affirming the district court's holding that an officer didn't act with discriminatory purpose when the defendant's tinted windows prevented the officer from seeing defendant's race before initiating the stop).

Without evidence specific to his traffic stop, that leaves Mr. Jones's statistical evidence. Mr. Jones relies on Professor Epp's testimony and affidavit to support his two discriminatory purpose arguments: (1) Officer DeLoux might've seen Mr. Jones's car before the traffic stop and determined his race; and (2) Officer DeLoux inferred Mr. Jones's race from the type of car Mr. Jones drove. The court already has rejected the first argument, above, concluding that Officer DeLoux didn't know Mr. Jones's race before he pulled Mr. Jones over. The second argument relies on Professor Epp's study, which the court considers now.

The Supreme Court and Tenth Circuit have held that a movant can't satisfy *Armstrong*'s discriminatory purpose element with general statistical evidence. *McCleskey*, 481 U.S. at 293 (declining to infer discriminatory purpose when defendant relied on a study to prove

discriminatory intent, rather than providing evidence about "decisionmakers in *his* case"); *Alcaraz-Arellano*, 441 F.3d at 1265 (declining to infer discriminatory purpose when defendant relied merely on statistics showing officer's stops targeted a disproportionate percentage of Hispanic drivers); *Mesa-Roche*, 288 F. Supp. 2d at 1194 ( "[I]n the context of constitutional claims under the Equal Protection Clause, the proponent cannot rely solely on statistical evidence[.]"). Professor Epp's study contradicts this principle. Professor Epp opined that Officer DeLoux could've used Mr. Jones's car—an older, domestic luxury vehicle—as a proxy to draw an inference about Mr. Jones's race. Professor Epp relied on statistics (showing that officers stopped older, domestic luxury cars at higher rates) and general social science literature (more Black drivers drive those type of cars) to support his proxy theory. Mr. Jones thus relies on Professor Epp's general hypothesis without any link to Officer DeLoux's record. Professor Epp didn't base either hypothesis on evidence particular to Officer DeLoux from the officer's testimony, the records Mr. Jones has received, or from any footage or report of Officer DeLoux's stop of Mr. Jones. The court declines "to do that which higher courts have already refused to do, infer discriminatory intent from the statistical evidence." *Id.* at 1193.

In any event, Mr. Jones's counsel acknowledged that Mr. Jones's general evidence can't carry the day. Recall that defendant filed a Motion for Additional Discovery (Doc. 36) concurrently with this Motion to Dismiss (Doc. 35). At the June 30, 2023, hearing, Mr. Jones's counsel recognized—as he must—that he viewed additional discovery as necessary to further his argument on the Motion to Dismiss (Doc. 35). Mr. Jones failed to make the prima facie showing necessary to secure additional discovery, so, naturally, his Motion to Dismiss fails, as well.

For these reasons, the court finds defendant has failed to carry his hefty burden to show discriminatory purpose. The court thus denies Mr. Jones's Motion to Dismiss.

V. Conclusion

For these reasons, the court denies Mr. Jones's Motion to Dismiss (Doc. 35).

**THEREFORE, IT IS HEREBY ORDERED BY THE COURT THAT** defendant's Motion to Dismiss (Doc. 35) is denied.

**IT IS SO ORDERED.**

**Dated this 6th day of October, 2023, at Kansas City, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**

20